NOT DESIGNATED FOR PUBLICATION

No. 120,653

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of

A.A., H.A., K.A., and B.B.,
Minor Children.

MEMORANDUM OPINION

Appeal from Harvey District Court; JOE DICKINSON, judge. Opinion filed September 6, 2019.
Affirmed.

*Jordan E. Kieffer*, of Dugan & Giroux Law, Inc., of Wichita, for appellant natural mother.

*Kaitlin M. Dixon*, assistant county attorney, for appellee.

Before ATCHESON, P.J., HILL and BUSER, JJ.

PER CURIAM:  A mother of four asks us to overturn a district court's order terminating her parental rights. She contends that there is insufficient evidence in the record to support the court's finding that she is unfit, and that she will be unfit for the foreseeable future and termination of her rights was in the best interests of the children. Our review of the record reveals to the contrary. We affirm the ruling of the district court.

*Legal proceedings about these children began in 2014.*

The State filed a child in need of care petition in March 2014, on three of the minor children, A.A., H.A., and K.A. Mother's fourth child, B.B., was born after the petition was filed. Another petition was filed on her behalf in January 2015. The cases

1

were joined and have been heard together since that time. There have been two motions to terminate Mother's rights. The first motion was denied by the court in June 2016. The second motion to terminate—the subject of this appeal—was filed in January 2018. The parties agreed to allow the State to submit the transcript from the first motion to terminate parental rights hearing as evidence in this appeal. Because of this agreement, we will briefly review what happened in that motion hearing.

*The first motion hearing focused on Mother's lack of improvement.*

The first child in need of care petition contained extensive information from past reports and investigations for the prior five years from the Department for Children and Families. The Department recommended that the children be placed in Department custody with out-of-home placement due to Mother's history of not making good decisions for her children and her inability to provide for the needs of the children.

The Department alleged that Mother:
- Had a long history of living with people and leaving the children with anyone that would watch them without knowing anything about the people;
- Mother had been offered family preservation services several times throughout the last five years, but had refused the services every time; and
- since August 2013, two of the children had been sent home from school five times with head lice and Mother did not follow through and treat the children—rather, the school had to wash the children's clothes and help treat them.

Following a temporary custody hearing, the district court ordered the children to remain in Department custody.

2

Mother entered a no-contest statement and the children were adjudicated children in need of care. The children were kept in Department custody with out-of-home placement. The case plan's goal was reintegration.

In late 2014 or early 2015, while the girls were staying with Mother for the weekend, Mother allowed a friend to sleep on her couch in the living room without informing Saint Francis Community Services because she knew he would not pass a background check. The girls were also sleeping in the living room because someone else was staying in their room. The friend sexually abused one or more of the girls. Mother stated that she did not know whether to believe the friend or her child. But she took A.A. to the hospital and had her examined.

In October 2015, the State moved to terminate Mother's parental rights. The termination trial was delayed until June 2016. Following a termination trial, the district court denied the State's motion. In the court's view, Mother's conditions had improved and it was possible she would be fit enough to care for her children in the near future.

After that, more permanency hearings were held and the court encouraged Saint Francis to increase Mother's visitation time and include overnight visits. Mother completed her case plan tasks, but Saint Francis did not increase her visitation time.

The agency adopted an extensive case plan. Around 30 tasks were assigned to Mother to help her achieve reunification of her family. The tasks related to the cleanliness of the home, the girls' hygiene, and supervision of guests in the home. They were designed to help Mother learn how to care for the children's emotional needs as well as their physical safety.

*The second motion to terminate Mother's rights focused on her inability to care for the children's emotional needs.*

In January 2018, the State filed its second motion to terminate Mother's parental rights. This time, after the hearing on the motion, the court terminated Mother's parental rights. The court found Mother unfit under K.S.A. 2017 Supp. 38-2269(b)(1): "emotional illness, mental illness, mental deficiency or physical disability of the parent, of such duration or nature as to render the parent unable to care for the ongoing physical, mental, and emotional needs of the child."

The court observed that, after four years of reintegration efforts, the visits were still of limited duration and monitored, and the children had adverse behavioral problems and anxiety around the visits. The court found that while many of the case plan tasks were completed, areas needed improvement including maintaining regular contact with the children's therapists and attending the girls' therapy. The court noted that over the course of the case there had been:

- sexual abuse of at least one of the girls;
- head lice;
- fleas;
- chaotic visits;
- adverse reactions to visits;
- limited visits due to safety concerns; and
- "most importantly, a mother with a limited capacity to deal with four high-needs children."

The court noted her limitations and her progress but decided it was not enough:

"There was evidence that the mother's IQ score is 71 and unfortunately, the one thing the mother cannot control is her native intelligence, and how that has impacted her ability to properly care for her four children. To her credit she has maintained a regular

4

job and is a good employee for Arby's, she has stable housing, a stable relationship with her boyfriend, and has made a good effort to comply with a reasonable reintegration plan. Her efforts have not been enough, however, to reintegrate her children back into her home. SFCS has not been unreasonable in not trusting the mother's ability to handle the four children."

Mother appeals, claiming insufficient evidence.

*The rules that guide us.*

Our law states a court may terminate parental rights when a child has been adjudicated a child in need of care and the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future. K.S.A. 2018 Supp. 38-2269(a). The statute lists nonexclusive factors the court shall consider in determining unfitness. K.S.A. 2018 Supp. 38-2269(b). There is a separate list of nonexclusive factors a court may consider when a child is not in the parent's physical custody. K.S.A. 2018 Supp. 38-2269(c). Any one of the factors in either subsection of the statute, K.S.A. 2018 Supp. 38-2269(b) or (c) may, but does not necessarily, establish grounds for termination of parental rights. K.S.A. 2018 Supp. 38-2269(f).

The law does not stop there. Upon making a finding of unfitness of the parent, the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child. K.S.A. 2018 Supp. 38-2269(g)(1). In making such a decision, the court shall give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2018 Supp. 38-2269(g)(1). We turn now to how we deal with appeals from these proceedings.

5

When this court reviews a district court's termination of parental rights, we consider whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational fact-finder could have found it highly probable—that is, by clear and convincing evidence—that the parent's right should be terminated. See *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011). In making this determination, an appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

We will review an extensive record and report significant testimony of witnesses presented by the State, by Mother, and some important exhibits admitted at the hearing. Given our standard of review, we hold the record supports the district court's findings and conclusions.

*We begin with the State's witness.*

At the second termination trial, Meagan Waltner from Saint Francis testified for the State. She began by recounting some positive evidence for Mother. Waltner testified that "there's a good bond [between Mother and the girls]. The girls love her and she loves the girls."

Waltner testified that Mother had:
- Completed all of her case plan tasks except the ones that required her to have the children overnight;
- submitted background checks for people who would be around the girls;
- maintained stable housing since September 2015;
- kept her home fit for children;
- maintained a clean home except for a flea infestation which she resolved;

6

- her and the girls checked for lice;
- maintained stable employment and submitted paycheck stubs to Saint Francis;
- provided for the girls' basic needs during visits;
- completed a parenting techniques class and successfully implemented skills she had learned;
- provided a plan for the girls' care and transportation;
- provided a budget plan;
- completed a psychological evaluation; and
- completed at least nine sessions of individual therapy.

Waltner testified about her concerns about family visits. At first, visits had been "pretty chaotic," but had improved. Mother thus asked for an increase in her visitation time. But Saint Francis still limited visits to two hours and monitored them because K.A. had been hospitalized for mental health issues and B.B. tended to have a severe increase in behavioral issues when visits were longer. B.B. had pulled her hair out in clumps after a visit, had nightmares, would cling to her caregivers, could not relax, constantly watched the door to see if she would be picked up for a visit, could be physically aggressive with peers, had some potty accidents, and did not want to bathe. B.B. had done better once she started having one-on-one visits with Mother without her sisters. Waltner speculated,

> "I'm not sure exactly what are the issues, but I feel like she got overwhelmed. The girls would just kind of be all over her and I didn't know if she just didn't like that or if something triggered her or what the issue was, but she does a lot better separated."

K.A. had shown aggression towards her foster parents and law enforcement was called. K.A. and A.A. both suffered from anxiety. K.A. had stabilized when visits were limited to two hours. When the visits were longer, there was an increase in behaviors. But

K.A.'s behavioral issues did not occur during the visits; rather, it was afterwards when she went back to her foster home.

There were no overnight visits permitted since the last termination hearing. Saint Francis decided against it because of the girls' behavioral issues. There was no evidence, however, that the nine-hour visits at Mother's home did not go well.

Waltner expressed doubt that Mother could parent all four girls at the same time and keep them safe because "we don't know who will be in and out of the home," Mother had not been in weekly contact with the girls' therapists, and Mother did not always understand the parenting skills she had learned.

Waltner testified that there continued to be a concern about people being in Mother's home that should not be there based on information gathered from Mother's mom and sister. But Waltner did not have specific names of people who had been in the home. And Mother denied it.

Mother had an IQ score of 71, which showed "a lower range of borderline intellectual functioning." Waltner testified Mother's IQ would hinder her ability to parent and to understand safety risks for the children. Waltner felt that Mother had done everything in her power to try to get her children back. She felt that Saint Francis had

> "implemented and tried to do everything we can do to help increase her ability to parent and still feel those have failed to help with her insight. I do not feel she understands the mental health needs and I think it is unfair to the girls to put them through that kind of mental chaos to increase visitations at this time."

. . . .

> "[S]he still lacks the ability of being able to keep them safe in certain situations. She does not understand what she's done wrong, how things will affect the girls."

Waltner's main concern was the girls' safety. As for the sexual abuse incident, Waltner was concerned that Mother had stated she did not believe the abuse would affect the girls long term and had not talked to the girls about the abuse.

Waltner admitted that Mother had no alcohol or drug issues, there were no abuse allegations, and Mother had not been diagnosed with a mental illness. Mother lived with her boyfriend, J.M., and Saint Francis had no concerns with him being in the home. They had a stable relationship and J.M. could help watch the children.

*Some significant exhibits were admitted at the hearing.*

The court admitted a letter from therapists for two of the girls, a parenting assessment from Wichita State University, and a letter from Mother's mother. All three expressed doubts about Mother's fitness to parent.

The letter written by A.A.'s and K.A.'s therapists begins on a positive note for Mother. She had contacted their office about every two weeks to inquire how the girls were doing in therapy. The therapists offered her guidance, Theraplay techniques, and answered Mother's questions. The therapists emailed Mother therapy techniques, but Mother had not read the emails. After several reminders to use the techniques, Mother had begun using them with positive results. The therapists wrote of their concern about Mother's ability to understand what the girls had experienced and how significant it was for them:

> "[I]t appears [Mother] continues to struggle to understand the veracity of the traumas the girl[s] endured and the effect of their removal from her care. It appears she continues to

minimize their reactions. One instance, she reported [K.A.] had displayed high emotionality while on a visit with her. We provided her with ways to address this and she voiced understanding and shared she would definitely utilize these techniques."

The therapists noted several reports of K.A. acting out at her foster home and Mother's home when Mother's visits were longer. When asked about their visits, A.A. and K.A. shrug their shoulders and changed the subject. "When this is further explored, both [K.A.] and [A.A.] express a love towards their mother yet feel apprehension regarding her ability to keep them safe." The therapists recommended that the girls remain in their current foster placements where "they report a sense of safety and belonging."

Next, a parenting assessment from the psychology clinic at Wichita State University was offered. The assessment did not include observations of Mother interacting with her children. The report noted that Mother became tearful when discussing her children and the limited amount of time she was allowed to spend with them. It stated that Mother could not resolve the fact that A.A. was abused yet B.B. was removed from her custody.

Mother showed inappropriate judgment when she told the alleged sexual abuser of A.A. to permanently leave her residence only after B.B., her youngest child, was removed from her custody over two months later. The report detailed past allegations of abuse and neglect of the children, but Mother denied those allegations. Mother reported she had earned her high school diploma and had been enrolled in special education classes. Mother scored below average on the Montreal Cognitive Assessment.

The report did offer details of some progress by Mother. During the assessment, Mother reported that she had learned from her parenting class to use timeouts when disciplining her children and, if they do not stay in timeout, to remove a tangible. She learned to baby-proof her home, such as locking up cabinets so the children cannot access

10

poisonous chemicals. Mother displayed some appropriate parenting knowledge such as reporting that it was important for the children to eat fruits and vegetables and to limit their sweets. She reported that her approach to discipline is to get at their eye-level and discuss with them why they are being sent to timeout. She reported that she offers toys as an incentive to listen and follow directions. Mother reported some appropriate parenting knowledge about child safety by recognizing when her children should see a doctor.

The report stated that Mother does have "some capacity to learn from appropriate support and education." Mother displayed several strengths including understanding the nutritional needs of her children, knowing when to take them for medical treatment, and displaying some appropriate disciplining techniques. But there was concern that Mother

> "may struggle with applying some parenting techniques. For instance, [Mother] reported that she puts a mark on a chart whenever her children misbehave and then she places them in timeout. Recording inappropriate behaviors is not consistent with positive parenting practices and it is likely that [Mother] misinterpreted or misunderstood the directions on parenting she was offered."

She "appears to think in a concrete and linear fashion and may have difficulty applying best parenting practices in novel situations."

Mother displayed an emotional connection to her children. But Mother displayed a "limited understanding of her children's emotional well-being." Mother has limitations when dealing with the children's emotions:

> "[Mother] was unable to identify if the children have any friends. Furthermore, [Mother] was unable to elaborate on her children's social, school, or emotional adjustment. She reported that they 'seem okay' or they 'seem happy.' Furthermore, when [Mother] was asked what she would do if she found her child playing undressing games with friends, she focused on removing them from the situation with no suggestion of discussing the

11

situation and trying to understand the child's emotional state. Similarly, [Mother] was asked what she would do if one of her children was performing poorly in school. She reported that she would talk to the teacher, inquire about using a tutor, and determine what she could do at home to help. Although these are legitimate responses, they ignore any emotional components that may impact a child's academic success. Although [Mother] displayed a limited understanding of her children's emotional well-being, she did display emotion concerning her children as evidenced when she cried while discussing being separated from them."

The last exhibit the court admitted was a letter from Mother's mom, who contended that the girls were not safe with Mother.

*Mother offers the testimony of coworkers and friends who came on the scene after the children were removed from her custody.*

Mother's boss at Arby's testified on Mother's behalf. He had employed her on and off for 12 years; she was one of his more trusted and "exceptional" employees.

A worker from the Family Advisory Council also testified on behalf of Mother. She offered herself as a resource for Mother if the children were returned to her custody. The Family Advisory Council is a privately funded peer-to-peer program that works with families and provides family preservation services. The Council could help Mother with time and financial management, and disciplinary and safety plans. The worker testified that if this case was dismissed, then she would be in the home immediately working with Mother, getting her into a routine with the girls, and helping in every way needed so Mother did not feel like she was alone. She would be there 8 to 10 hours the first day and then 2 to 3 hours a day for the first couple of weeks until things became routine. She would be there for Mother for "however long she needs."

The worker had talked to Mother often for about a month and Mother was "very open" to her services, though Mother had at first been scared of accepting outside help

12

when they began their contact. The worker testified she had also contacted other agencies to become involved here including the Prairie Independent Living Resource Center, an organization that works with disabled people, and the Guardian of Children, an organization that works with families with children that have been abused. The worker became involved with Mother because she is a good friend of J.M.'s aunt and had been at family functions.

J.M.'s aunt next testified on behalf of Mother. The aunt had worked in the child welfare system in permanency case management for 14 years at TFI Family Services and Saint Francis. She became involved with Mother's case in October or November 2016. She had attended every case plan conference since December 2016 with Mother and J.M. She helped Mother review her case plan goals. While Mother was at first afraid to accept help, she eventually accepted it. The aunt testified she would be available on site to help Mother with the children when they returned home.

The aunt testified that Mother had "done everything that they've asked her" and was willing to do more. As for Mother's IQ, the aunt testified, "sometimes she may not have the knowledge at first, but if you give her the information, she retains that information." Mother had been keeping a notebook with her children's appointments, diagnoses, and medications. The aunt testified that she had been to a few visits and Mother did well with the children. She did admit, however, that Mother's mom and sister stopped by once during a visitation and Mother let them in for a few minutes even though they were not supposed to be there.

She testified Mother and the children had a "very good bond" and the children were "very fond" of J.M. She had no safety concerns with the children going home. She believed Mother could parent her children even without assistance from outside agencies. She attributed the children's anxiety and behavioral issues to the trauma of having to move around to different foster homes.

*Mother speaks for herself.*

Mother testified that she wanted her children home. She testified that if her children came home, then J.M. would work night shifts and she would work day shifts so someone would be with the children. She would use Saint Francis' aftercare services and contact the Family Advisory Council or J.M.'s aunt for help. She testified that when she saw her children, they "jump on me, give me hugs and kisses, say I love you, mom. When it's time to go, they don't want to really go, they want to stay longer."

As for people coming in and out of the house, Mother testified that if people knocked on the door during visits, she told them to leave. She admitted that she had let her mom and sister in the house during a visit in November 2017, even though she knew they were not allowed to visit.

As for the girls' appointments, Mother had been attending B.B.'s appointments regularly since October 2016, but she had not been informed when the other girls' appointments were. The girls were in different foster homes. When she was informed of an appointment, she made an effort to go. She kept track of the appointments on her calendar. She testified that she had called her children's therapists every week, but sometimes they did not return her calls.

Mother offered a letter written by her therapist. The therapist wrote that as of June 1, 2017, Mother had benefited from therapy and was stable. But he had not seen her since then and he could not comment on whether ongoing therapy was medically necessary.

B.B.'s foster mom testified briefly about B.B. coming back from a couple of visitations with fleas.

At the end of the hearing, the guardian ad litem recommended termination of Mother's rights.

The court found that while the Council and J.M.'s aunt could have been helpful resources, Mother failed to take advantage of this support prior to the hearing. The court also found that it was unlikely those resources would change the conditions that led to the proceeding because Mother's "limitations would remain, as well as the high needs of the children."

*We conclude that there is sufficient evidence here to support the court's rulings.*

Mother maintains that the court erred because there is no clear and convincing evidence that she is unfit or it is in the best interests of the children to have her rights severed. The State replies with five points:

- Mother allowed A.A. to be sexually abused by someone who was not approved to be in the home;
- Mother continued to allow people in her home who posed a safety risk;
- Mother had a mental deficiency and could not provide for the emotional needs of her children;
- the children displayed behavioral and emotional issues before and after visits with Mother, but had a sense of safety and belonging in their foster homes; and
- a skepticism that Mother could parent all four children at the same time or for longer than two hours at a time.

The State also argues that all four children have been in the Department's custody for most of their lives and need permanency.

15

We need not repeat the extensive testimony that we set out above. Waltner's testimony gives many details about Mother's unfitness and the district court relied on it. On appeal, her testimony supports the court's findings. But we find two points significant. First, in the letter from the children's therapists, they noted that Mother continues to struggle with understanding the emotional trauma experienced by the children. Additionally, they expressed concerns about Mother's understanding of the emotional effect removing them from her custody has had upon them. They expressed their concern that Mother continued to minimize the children's reactions to those two events.

The second point comes from Mother's parenting evaluation from Wichita State University. That report clearly states that Mother cannot understand the emotional needs of her children and displays inappropriate judgment and lack of insight. The report cites as an example that Mother asked the alleged sexual abuser of A.A. to leave her home only after B.B. was removed from her custody two months later. And Mother did not understand why B.B. had to be removed.

To us, these two points rebut Mother's argument that the district court used mere speculation to find that Mother's mental deficiency affected her ability to parent her children. When we view this evidence in the light most favorable to the State as the law requires, this is clear evidence that supports the termination of Mother's parental rights. After all, we are here to examine the record, not reweigh the evidence. See *In re B.D.-Y,* 286 Kan. at 705.

Moving to the legal arguments, we focus on Mother's two cited cases. In the first, *In re J.S.*, No. 115,529, 2016 WL 6139109, at *6 (Kan. App. 2016) (unpublished opinion), a panel of this court reversed a termination decision after the children had been away from the mother for over three years because the district court's opinion seemed to be based on *what might happen* if parental rights were not terminated, not on the evidence of what had happened. The panel concluded that the State failed to prove

16

"specific, concrete examples" of the Mother's unfitness to a parent. There were no allegations of addiction, filthy living conditions, a dangerous relationship with a boyfriend, or lack of interest in the children.

The district court cited Post Traumatic Stress Disorder as a condition that made the mother unfit to be a parent. But the concern that unresolved PTSD could be triggered and prevent the mother from parenting was based on speculation. 2016 WL 6139109, at *5. The court noted that the mother "clearly had the mental capacity to obtain stable housing and income, attend all of the court-ordered classes, and successfully complete her other orders." 2016 WL 6139109, at *6.

That is a far different case than this. There is no speculation by the court here about what might happen because it has already happened and there has been no real improvement in Mother's condition.

In the second case, another panel of this court reversed a termination decision based on what might happen in the future if it did not sever Father's rights. The panel said there was "very little concrete evidence to support a finding of unfitness and certainly not enough to meet the higher burden of clear and convincing evidence." *In re H.J.P.*, No. 106,727, 2012 WL 1524473, at *7 (Kan. App. 2012) (unpublished opinion). Again, we contrast the lack of evidence in *H.J.P.* from this case.

Here, the district court cited the children's adverse behavioral problems and anxiety around the visits; chaotic visits; Mother's failure to maintain regular contact with the children's therapists and attending the girls' therapy; the sexual abuse of at least one of the girls; head lice and fleas; limited visits due to safety concerns; and "most importantly, a mother with a limited capacity to deal with four high-needs children." All of the court's concerns are supported by the record.

17

We conclude that the authorities relied on by Mother are unpersuasive.

When we turn to Mother's argument about her fitness to parent in the future, we conclude the district court must be affirmed.

While no court can peer into a crystal ball and decide what is going to happen, a court can examine the evidence of past behaviors and the capacity of the parties to improve in order to decide these questions about future unfitness to parent. See *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982). That is what the district court did here. The court weighed the length of time these children have been out of Mother's custody—since 2014 for the three older children, and since 2015 for the youngest child. Then, looking at the professional reports, that evidence led the court to a reasonable belief that even with help, Mother cannot understand the emotional needs of her children and could not demonstrate an ability to keep them safe. That is a judgment for the trial court and we will not substitute our judgment for the judge, who is required to observe the witnesses and the parties, and to weigh the evidence. Since the evidence supports the district court's finding on whether Mother will remain unfit in the future, we will not find otherwise on appeal.

Having found Mother to be unfit and that her unfitness would persist at least for the foreseeable future, the district court assessed whether the best interests of the children favored termination of the parent-child relationship. The district court concluded they did. Mother, in turn, has also appealed the best interests component of the district court's decision.

A child's best interests are evaluated somewhat differently than unfitness or unlikelihood of change. As directed by K.S.A. 2018 Supp. 38-2269(g)(1), the district court shall give "primary consideration to the physical, mental[,] and emotional health of the child" in making a best interests determination. A district court decides best interests

18

based on a preponderance of the evidence. See *In re R.S.*, 50 Kan. App. 2d 1105, 1116, 336 P.3d 903 (2014). The decision essentially rests in the district court's sound judicial discretion. 50 Kan. App. 2d at 1115-16. An appellate court reviews those sorts of conclusions for abuse of discretion. A district court exceeds that broad latitude if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011).

Without repeating the evidence, Mother was unable to fully grasp the emotional needs of her children and effectively meet those needs, leaving a substantial gap in her ability to nurture them as they grow up. The law requires that parents be able to meet at least the basic needs of the children for both physical necessities, such as food and housing, and emotional stability. Similarly, Mother appeared to have difficulty retaining and applying moderately involved parenting skills aimed at protecting the safety of her children. Those considerations support the district court's best interests determination, and we can find no abuse of judicial discretion there.

We recognize that this is a tough decision. The court was coping with some time pressure here because the children have been in foster care for so long with limited visitation with Mother. Permanency decisions need to be made in "child time" rather than "adult time." *In re D.T.*, 30 Kan. App. 2d 1172, 1175, 56 P.3d 840 (2002). And we are beyond that here.

This court cannot and will not reweigh the evidence. But viewed in the light most favorable to the State, the evidence that Mother was unfit by reason of a mental deficiency "of such duration or nature as to render [her] unable to care for the ongoing physical, mental, and emotional needs of the child" was clear and convincing. See K.S.A.

2018 Supp. 38-2269(a)(1). Likewise, termination of parental rights was in the best interests of the children.

Affirmed.